Slack Bros., Inc. v. Commissioner.
Slack Bros. v. Commissioner
Docket No. 416 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 182; 2 T.C.M. (CCH) 452; T.C.M. (RIA) 43337; July 24, 1943
*182 C. J. Batter, Esq., for the petitioner. Royal E. Maiden, Jr., Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The claimant filed a claim for refund of processing taxes in the amount of $25,440.44 under the provisions of Title VII of the Revenue Act of 1936, which claim was disallowed in full by the Commissioner on October 10, 1941. Findings of Fact The claimant was a processor within the meaning and intendment of the Agricultural Adjustment Act, as amended. It filed returns and paid processing taxes $25,440.44. It filed a claim for refund which was disallowed in full by the Commissioner on October 10, 1941. On January 7, 1942, the claimant filed its petition for review with the United States Processing Tax Board of Review. The claimant was incorporated in April, 1932, under the laws of Louisiana and its principal office is at Rosedale, Iberville Parish, Louisiana. Ever since its organization it has been engaged in the growing and buying of sugar cane and the processing thereof into sugar and other products. It owns plantations and a sugar factory located on one of them. The plantations are located about four miles from Rosedale, which is about twenty *183 miles west of Baton Rouge near the northern end of the sugar belt. The sugar cane is planted in the latter part of September and October and harvested the following year beginning in October. The harvesting and operation of the sugar factory begin as soon as the sugar cane is ripe enough. The operation of the sugar factory continues until the entire crop is processed, and sometimes into January, the period of operation being usually from two to three months. The claimant entered into a Sugar Cane Production Adjustment Contract dated January 23, 1935. It received benefit payments under the provisions of such contract in the following amounts: Advance 1943 payment under Section
15 (b)
$ 9,551.03
Final 1934 payment under Section
15 (c)
16,242.42
$25,793.45
Advance 1935 payment under Section
16 (a)
$ 5,327.78
Final 1935 payment under Section
16 (b)
2,083.42
$ 7,411.20
The claimant manufactured plantation granulated sugar, second sugar, raw sugar, first molasses, second molasses and blackstrap molasses, all being edible products except blackstrap molasses which is usually used for feed and the manufacture of alcohol. It manufactured no powdered sugar, brown sugar or other *184 specialties. It used the sulphitation process of refining which is a continuous process from cane to the finished product. The cane is ground and the raw juice therefrom is treated with sulphur and lime and run through the clarifier and then through the settlers for the removal of dirt and sediment. It is then boiled into a density of from 28degree to 30degree Beaume forming a syrup which is allowed to settle in the syrup tank and made into granulated sugar. A second sugar is produced from the molasses or tailings of the first sugar, and a third sugar is produced from the molasses or tailings of the second sugar. The tailings of the third sugar is blackstrap molasses. Each of the products is salable. In its operations the claimant does not re-melt raw sugar for the purpose of making refined sugar as is done in a sugar refinery. There are other processes of refining sugar known as the bone char process and vegetable carbon process. The claimant bought sugar cane to be processed in its sugar factory from growers within a radius of approximately ten miles of its factory in competition with about five other sugar factories in that area. The price paid for sugar cane depended upon its *185 sucrose content. The execution of the sugar cane production contracts did not destroy all competition which continued to affect amounts paid to growers for trucking and handling the sugar cane and also the service to shippers. Claimant's sales market was within the Mississippi Valley. It sold its products in competition with not only five or more sulphitation processors but also bone char processors and vegetable carbon processors and sugar beet processors. Its selling price for granulated sugar was 25 to 35 points below the bone char sugar prices quoted by American Sugar Refinery. During the tax period most of claimant's sales were made at a discount of 35 points. The vegetable carbon process sugar is usually priced at 10 points below bone char processed sugar. The sugar was packed in 100 and 50 pound bags and some in 10 and 5 pound bags. The brand of its sugar was Liberty Granulated Sugar. It sold its sugar through a New Orleans broker. It had no sales organization of its own. Since claimant sold is sugar in competition with other sugar it was required to sell its product upon terms similar to those of its competitors. One of these was the four-payment plan, which permitted the *186 purchaser to make payment of the invoice price in quarterly payments, the first payment 10 days after the receipt of the shipment and the three remaining quarterly payments at the end of successive intervals of seven days, so that payment in full was not completed until 31 days after the receipt of the shipment by the purchaser. Under this plan claimant guaranteed the quoted price against decline. The guarantee against a decline was made at the same number of points as the number of points sold under American Sugar Refinery prices. If the price declined, the purchaser was permitted to deduct the amount of the decline from the invoice price. The guarantee against decline in price was applicable only to unpaid installments. The claimant sold at prevailing prices when an advance in price was imminent for the reasons that it did not have sufficient warehouse facilities and needed the money to pay its operating expenses, and for the further reason that if it did not do so it would lose sales to its competitors. In the early part of 1933, there were large excess stocks of sugar in Puerto Rico, the Philippines, Hawaii, Cuba and in the United States and refiners, processors and growers of *187 beet and cane sugar of Cuba, Puerto Rico, Hawaii, the Philippines and the United States began negotiations, under the auspices of the Department of Agriculture, to reach an agreement for the purpose of limiting the market supply of sugar in and to the United States in order to stabilize the price. As a result of these negotiations, large supplies of sugar were held in check and the price of raw and refined sugar increased steadily. The price of raw sugar at the beginning of 1933 was about $2.80 per 100 pounds and reached a peak in mid-September of $3.65 per 100 pounds. In late August or early September, 1933, the group of growers and processors reached an agreement. About September 15, 1933, the representative of the Department of Agriculture, at a conference with the group, announced that the agreement which they had formulated was not satisfactory and that it would not receive his recommendation. On October 9, 1933, the Secretary of Agriculture formally announced, after a conference with the President, that he would not sign the agreement. Consequently, all the excess supplies of sugar held in check in expectation of the adoption of a stabilization agreement were released. This *188 coincided with the processing of the beet sugar crop which produced 300,000 tons more sugar than had been produced in any year before 1933. These circumstances caused a decline in prices. From a high of $3.65 per 100 pounds in mid-September, 1933, the price of raw sugar steadily declined, with a slight interruption in February, 1934, to $2.80 about June 1, 1934, and the price of refined sugar declined from a high of $4.70 to $4.10 per 100 pounds over the same period of time. At least 50 per cent more sugar was available than could be consumed in a year. The President sent a message to Congress recommending that sugar be made a basic agricultural commodity by an amendment to the Agricultural Adjustment Act. In a press release dated March 16, 1934, the Secretary of Agriculture advocated the passage of the sugar amendment. On May 9, 1934, the Jones-Costigan amendment to the Agricultural Adjustment Act was approved by the President, which made sugar a basic agricultural commodity, effective June 8, 1934. A processing tax of 53 1/2 per 100 pounds on refined sugar thereupon became effective, and the price of refined sugar increased 55 per 100 pounds. Two reductions in tariff on off-shore *189 raw sugar coming into the United States from certain foreign countries were made during the time the processing tax was effective. After the decision of (January 5, 1936), the Secretary of Agriculture announced that in his opinion all of the provisions of the Act applicable to sugar, except the processing tax, remained in effect. The system of quota control remained in effect. During the period from early spring in 1933 to June, 1934, conditions in the sugar industry were confused. The statutory tax period is the period beginning June 8, 1934 and ending November 30, 1935. The statutory average margin per unit (tons of sugar cane) of commodity processed during the tax period, without treating benefit payments as a reduction of the cost of the commodity processed, was $2.8038 per ton. The statutory average margin per unit of commodity processed during the tax period, treating the benefit payments as a reduction of the cost of the commodity processed, was $3.3596 per ton. The statutory average margin per unit of commodity processed during the statutory period before and after the tax was $2.6938 per ton. The margin *190 per unit of commodity processed from the 1936 crop during the months of October, 1936 to January, 1937, inclusive, was $2.4356 per ton computed in the same manner in every respect as the statutory margins above stated. The units of commodity upon which the claimant paid the processing tax were 28.039.22 tons and the total units of commodity processed by the claimant during the tax period were 47,855.29 tons. The claimant employed no chemist and consequently had no records or analyses essential for the determination of the 96degree raw value of the sugar cane. No payments were made by the Secretary of Agriculture to any grower of sugar under Section 8, Paragraph 7, of the Agricultural Adjustment Act as amended. The claimant had no direct consumption sugar on hand at June 8, 1934, and paid no floor stocks tax under the provisions of the Agricultural Adjustment Act as amended. The claimant paid processing taxes of $25,440.44, no part of which has been refunded. The processing tax was not billed separately to petitioner's customers on its invoices, except that upon nine invoices covering molasses the taxes aggregating $565.35 were shown separately. Opinion STERNHAGEN, Judge: *191 The claimant paid $25,440.44 processing tax. Of this amount, $565.35 was shown as a separate item on the invoice of molasses sold by claimant. The claim is for a refund of $24,875.09. Section 907, Revenue Act of 1936, provides that where the average margin during the tax period is not lower than the average margin during the period before and after the tax "it shall be prima-facie evidence that none of the burden of such amount [of the tax paid] was borne by the claimant but that it was shifted to others". The average margin during the tax period was stipulated to be $2.8038 per ton (without treating benefit payments as reduction of cost) or $3.3596 per ton (treating benefit payments as reduction of cost) and $2.6938 per ton during the before-and-after period. The average margin during the tax period was at least $0.11 per ton higher than during the before-and-after period. The question to be determined therefore is whether the evidence overcomes the prima facie effect of the unfavorable margin to it. On the effective day of the tax of 53 1/2 per 100 pounds the wholesale price of sugar increased generally about 55 per 100 pounds. The claimant's selling price was fixed at a differential *192 ranging from 25 to 35 points below the American Sugar Refining Company price. The evidence fails to show that the American price did not follow the general rise and that its price during the tax period did not include any part of the tax. The differential in price was not intended to eliminate and had no relation to the tax. The contention of claimant that it did not shift the tax is based upon general circumstances affecting the sugar industry and the declared design and purported administration of the Jones-Costigan Act so as to prevent the passing on of the tax to the consumer, to the producer, or labor. The character of the evidence produced was as general as its arguments. It also argued that a base period other than that provided by the statute should be used which would show a spread in margins favorable to the claimant. Upon a similar argument it was held in , promulgated June 15, 1943, that evidence of concrete facts was necessary to overcome the prima facie effect of the unfavorable spread in margins and that without such a showing a finding that the tax was borne by the claimant and not shifted "in any manner *193 whatsoever" was not warranted under the statute. Upon the showing made here as in , we hold that the claimant has failed to overcome the prima facie effect of the spread in margins unfavorable to it and has failed to prove that it bore the burden of the tax and did not shift it by any means whatever. The claimant is therefore not entitled to the refund as claimed. Decision will be entered accordingly.